May it please the Court, Amy Beverland under the supervision of Caleb Mason for Petitioner Nelson Acosta-Roque. I'll be splitting my argument time with Jennifer Mnookin, Vice Dean of UCLA Law School and Counsel for the Amici. I would like to reserve one minute of rebuttal with your permission. The government contends that Acosta and Victor Aaron Bolas are the same person, but when there's no reasonable fact finder could find that the government satisfied the burden of clear and convincing evidence. The government's sole evidence in this case is the testimony of one fingerprint examiner, Ms. Susan Bly. When her testimony is balanced against the countervailing evidence in the record, it's quite obvious that the two men are different people. Part of the evidence that is presented in the record is that they had different heights, different residences on opposite sides of the country, and in particular the sworn affidavits of six individuals with personal knowledge of Acosta's whereabouts in January of 1991. January of 1991 is the date, is the month in which Aaron Bolas was arrested for selling cocaine in Pennsylvania. These affidavits, which this Court must take as true, state that... We have to take what is true? The affidavits that were presented by Acosta before the IJ and the BIA, neither body made a determination, an adverse credibility determination with regard to these affidavits, and case law requires that this Court must accept the contentions contained in the affidavits as true on appeal. So what is our standard of review overall? The standard of review here is whether a reasonable fact finder could find that the government established identity by clear and convincing evidence. And on this record, we argue that no reasonable fact finder could do so. The affidavits state that Acosta never left the Dominican Republic during 1991. No person can be in two places at the same time. How many years after 1991 were those affidavits filed? I'm not sure. I'm not completely sure about that. But they were filed by individuals with that month of time. And if he was in the Dominican Republic during that month, he couldn't have also been the individual selling cocaine in Pennsylvania. I think it was filed in 2009. Okay, thank you. So that was 18 years after that. They're attesting that he was in the Dominican Republic during that month. And we have to take these as true, irrespective of fingerprint evidence? Well, the fingerprint evidence presented here, which is predominantly what the IJ and the BIA subsequently relied on in determining that identity was established, was both incomplete and misleading. The testimony presented here was incomplete with respect to the fact that she failed to tell the court the finger she examined, the number of print corresponding characteristics she found that were in common. We simply have no way of establishing the methodology that she used to establish that these two individuals were one and the same. Were these challenges raised during the administrative hearing to the fingerprint evidence? Yes, they were. The broad propositions were raised below. What do you mean by that, the broad propositions? What specifically was raised? Acosta, who was representing himself before the IJ and the BIA, raised the issues that this wasn't him, that the fingerprint evidence, these weren't his fingerprints. He also raised the fact, he asked. That's pretty broad. Yes, very broad. He also claimed that he wanted to know how she came to this conclusion. He wanted to know about the process. He wanted to know how the initial match was made. He made various attempts to cross-examine Ms. Bly on her testimony. However, the IJ, as you can see at the record, pages 140 through 144, consistently cut off his attempts to cross-examine Ms. Bly. And when an individual represents themselves pro se, this Court construes his attempts very liberally. So while the broad propositions were presented below, our briefs represent the more full development of the issue. The testimony was inaccurate because she claimed that she was 100 percent certain that Acosta and Uramboulos were the same person. However, a claim of 100 percent certainty, which examiners are advised not to make, suggests that the scientific basis for fingerprint evidence is also infallible. However, the changing landscape of fingerprint identification has made it very clear that there can be, it's not 100 percent certain that Isn't it, haven't the largest doubts been raised in the context of latent fingerprints as opposed to the kinds that we have here? Yes, and we, the government makes this contention in its brief, and we responded in our reply brief, noting that many of the problems between latent and full print comparisons are still met, you know, the same problems. Help me with the record here. Weren't there three cards that the technician used to compare? I believe there were three sets of prints that were used to compare, or at least she was provided with three sets of prints. We're not sure which prints she did compare, which fingers she compared, and which prints she was looking at when she telephonically testified. The burden here is not beyond any doubt whatsoever, not beyond some metaphysical doubt, but simply clear and convincing evidence. And for decades, fingerprint evidence in this kind of context has been accepted as reliable and something on which fact-finders can rely. So, I mean, wouldn't we be striking out in a rather novel direction if we were to accept your argument? No, I don't believe so. I think that this Court has an opportunity in this case, particularly in the immigration context, where the immigration courts are seeing some Well, we have an opportunity to do something novel. I agree with you. But, I mean, do you have a case that would help you convince us that we should strike out in this direction? I think that, I don't think there's a case that would allow, that would bring the Court to, in the case of fingerprint evidence, I don't think that there is a guiding precedent that suggests that fingerprint evidence needs to be, that the way in which clear and convincing evidence standard is applied to fingerprint evidence should be addressed by this Court. But this Court can review the determinations of the IJ and the BIA, so that it's, you know, not stepping Because evidently there was another technician who reinforced the conclusion of the witness. Isn't that right? At least that was the testimony. Yes. She stated that her conclusion was verified by a second print examiner. We don't know the process by which that occurred. No, we don't. We don't know the person's name either. We don't know the person's name. We don't know anything about the second verification. And there, you know, which Dean Mnookin can speak to this more fully, but there are, you know, certain issues that suggest that verification doesn't necessarily provide, you know, an absolute verification, because it's not non-blind. They know the conclusion they're supposed to reach. So there's, you know, a problem there as to whether the verification is adequate. So if we were to accept your argument, what would our holding be? In the narrowest sense, we're asking the Court to hold that the government didn't meet its standard of proving identity by clear and convincing evidence based on the countervailing evidence in the record. In a broader sense, we're asking the Court to provide appropriate guidance and clarification as to how the clear and convincing evidence standard should be applied to fingerprint evidence in the immigration context. And what would that guidance consist of? The guidance would consist of providing more transparency in the testimony. A fingerprint examiner should note the number of fingers she examined, note the corresponding characteristics that she found, make clear the prints that she's comparing. And all this must be volunteered by the fingerprint expert, even in the absence of cross-examination? Well, as I stated before, Acosta attempted to make, to cross-examine. I just looked at AR 140 through 144. I wasn't very impressed with his cross-examination. Broad propositions was being generous. Well, he's appearing pro se, and he didn't know very much about fingerprint evidence. That was his choice. It was his choice. And I'm wondering what the IJ is supposed to do when he appears pro se and does not ask good questions. Well, and he attempted to point out that there was a discrepancy between the prints as well, and she failed to explain the discrepancy. He said he didn't have a scar. He did, but then he pointed out there was a discrepancy in the prints, which she apparently wasn't able to notice in the beginning, and subsequently suggested that it could be a scar or it could be a rolling of the prints. And it was an unexplained discrepancy, which a majority of fingerprint examiners suggest when there is an unexplained discrepancy, even one, that that necessitates exclusion rather than identity. Did you have both copies of the prints in the record? We did. Did anybody look at those prints? Did you have any outside experts look at those prints and tell us that she made a mistake? The prints were provided to other experts. However, the prints in the brief are not clear enough for someone to use the copies in the brief to make an adequate identification. I'm going to hand it over to Dean Minooka if that's okay. Hi. Thank you, Counsel. Thank you. Once again, we thank Southwestern Law School for its assistance in this case. May it please the Court, Jennifer Minookan on behalf of the amici in this case, 39 scientists and scholars who did want to weigh in about the fingerprint testimony in this case. The difficulty with Ms. Bly's testimony is twofold. On the one hand, she gave a kind of trust me testimony that was very much ipsedixit with no documentation of what she actually did, how many prints she looked at, how many characteristics in common she found in each of the prints that she examined. We simply don't know anything about what she did. There's remarkably little documentation to support her conclusion. Coupled with that lack of documentation and description, she expressed her conclusions in dramatically overstated terms. She talked about having 100 percent confidence. She said that she could make this determination to the exclusion of all others, a form of individualization testimony, which consensus is emerging, is really not advisable or warranted by scientific findings. But are you saying that an administrative fact finder cannot rely on the testimony? Doesn't that go to the weight as opposed to whether or not? It does. I think it does go to the weight. But what we have here is a combination of under-justification and over-claiming. And that pairing, coupled with some countervailing evidence in the record, suggests that it's, I think this form of 10-print testimony isn't clear and convincing. I don't mean to suggest, and I don't think many or any of those who signed the amicus brief would suggest that 10-print evidence can't ever be clear and convincing. Certainly we think it can. But fingerprint evidence is less scientifically justified, less studied, and less is known about it than one might, than many people would expect. Do your clients make a distinction between latent fingerprint evidence and the type of fingerprint evidence, what I call direct fingerprint evidence? They do, at least in theory. That is to say, 10-print evidence typically is higher quality and there's vastly more information available. That should affect what we're able to know about it. However, on this record, we don't know that it did. Some 10-print examiners make their identification looking at simply one print from each of the 10 prints that are typically available to them. Others look at all 10. If they're looking at just one, it's not so different from latent prints. There is somewhat more information available, but if we don't know how many minutia they found in common, we can't even know that. So while I think there is a distinction to be made between 10-print examination and latent print, part of the precise problem here is that on this record we have no idea whether she made effective use of the increased quality. What we have to determine is whether or not there is substantial evidence to support the decision that was made by the administrative law judge. That's not a very difficult standard to meet. So is it your position on behalf of the people you represent that this was not even substantial evidence? Well, I think it is our position that on this record it wasn't clear and convincing evidence. That is to say, she didn't tell us anything about what she did, so she comes to – she comes and says, I found a match, I'm completely 100 percent certain, and there you have it. It's pure ifs and dicks it. And her claims about 100 percent certainty are not warranted. No human endeavor is ever 100 percent certain. It also – it goes beyond just being a personal claim of hers because she's essentially, at least implicitly, warranting that the science can be 100 percent certain. Whereas, in fact, there's remarkably little scientific study about just how accurate fingerprint examiners are in either the latent or the 10-print context. So by itself, for her to come in and say, I did something involving looking at these prints that led me to a conclusion of which I'm certain in the face of some degree of countervailing evidence and no explanation of what she did, I think Mickey would think that that was sufficiently unjustified and misleading as to not constitute clear and convincing evidence. All right. Thank you, counsel. Thank you. We have time left for rebuttal. We'll hear from the government. Your Honor, may it please the Court. Stuart Nick on behalf of the respondent, U.S. Attorney General. The dispositive issue in this case is not whether fingerprint evidence is generally reliable.     does that mean that the evidence is generally reliable? The issue in this case is whether the evidence that's actually contained in the administrative record or whether the petitioner has demonstrated that the evidence contained in the administrative record would compel any reasonable fact finder to conclude that Mr. Acosta-Roeb and Mr. Ambarroz were different individuals. This record, the evidence actually contained in the AR, is simply not sufficient to compel such a conclusion. You have the testimony of an expert fingerprint examiner with 20 years of experience who has conducted thousands of analyses of fingerprint identification and has more than 720 hours of fingerprint training testifying that the fingerprints matched that the, I believe there are actually four fingerprint cards, three from Mr. Acosta-Roeb and then one from Mr. Ambarroz' 1991 conviction testifying that those fingerprints all matched. That testimony in and of itself is sufficient. It is substantial evidence supporting the agency's determination. The petitioner's challenge to the reliability of fingerprint evidence generally and the major problem in the petitioner's case is the statutory provision governing the court's review of immigration cases and that's INA 242b4a or 8 U.S.C. 1252b4a which states that the court of appeals shall decide the petition for review only on the administrative record on which the order of removal is based. The petitioners are essentially now attempting to litigate the reliability of fingerprint identification evidence in the courts of appeals using evidence that was not raised in front of the immigration judge that was not raised in front of the board and in terms of relying on that evidence it violates the statutory provision but it also, you can't rely on that evidence just to say that the board and the immigration judge erred in concluding that the evidence established that the petitioner and Mr. Ambrose were the same individual. Because it's not unusual for us to consult secondary sources or case law in making a decision regarding an issue that's before us. How is this any different? Because the petitioners are relying on scientific evidence. The studies that have been done on fingerprint identification evidence. The factual cases in which misidentification. They're relying on specific facts not simply case law. They're attempting to establish that Investigator Blay's testimony was unreliable based on facts that were never raised in front of the agency. Are you saying that the district court could not have considered these studies or only that we could not, cannot? Well, I'm saying that under the... I mean, I'm sorry, the administrative agency. The agency, had they been presented to the agency, certainly the agency should and would have been obligated to consider them. Why? Because it would be then a matter of judicial notice? Is that what you're saying? Well, I mean, if the evidence had been actually presented to the administrative record, yes, the agency would have been obligated to consider them because they were part of the record. Why can't we not do that? Because, again, they were not, that evidence was not presented to the agency. These studies... Well, so you're making the argument that our review is simply on the record. Exactly. Yes. And, again, that's... Don't we have cases in the Ninth Circuit that allow for the notice of so-called, leaving aside judicial notice technically, the notice of so-called legislative facts? Well, the distinction between legislative and adjudicative facts, I can't speak to the specific case law on that issue. But we're not talking here about legislative facts. We're talking about specific and adjudicative facts in terms of contrary evidence. But I don't know. It seems to me that legislative, that nonjudicial notice, that is notice of studies and that sort of thing, even opinions by law professors can be taken even if those opinions have something to do with something called adjudicative facts simply because they help courts with policy and, as it were, their common law duties to develop the law in the correct direction. Our apologies. My hearing is not very good. I'm hoping I'm hearing you correctly. I'm sorry. I have the same problems, by the way. But I... It seems to me that courts can take notice of so-called legislative facts to help them determine the direction in which the law ought to go and improving itself. And, frequently, we do refer, with respect to legal matters, to law review articles that contain certain kinds of assertions of a factual character on which we rely. Isn't that true? I think that's true. That's often in respect to, as you said, policy decisions. And it's not, and the cases cited in the Petitioner's brief as to adjudicative facts, none of them are in the immigration context. None of them are cases in which you have a review of an administrative agency's determination as to a particular issue. Even if we were to look at these things, and I've looked at most of them, do you think they really hurt your case that much? No, I do not believe they do, Your Honor. And, again, we did not cite contrary evidence because, again, I believe I was precluded from doing so by the statute. But you've also got a huge number of precedents in your favor, do you not? Yes, yes. I mean, how can we overrule all that? I don't believe you can. I think this Court's decision in the Calderon-Segura case, which was cited in our brief, is pretty clear on rejecting many of the arguments the Petitioner raised. The Calderon-Segura is 512, F3D, 1104. And that was a criminal case in which the Court rejected these arguments. This was in the context of a Daubert disability issue. But the Court made the same distinction as to the difference between latent prints and exemplar prints, that the examples of misidentification brought about by the Petitioner, examples of cases in which you had mistakes, were almost exclusively in the context of a latent print, you know, a print left behind of questionable quality at a crime scene, comparing that, not a comparison between inked exemplars taken in controlled circumstances and presumably of much greater visual quality. It rejected the – some of the scientific arguments as to the notion that it hasn't been proven that fingerprints are unique. And, again, Calderon-Segura, I think, is very clearly on point on this issue, that fingerprint evidence is generally considered reliable. And that's a – it's been established through 100 years of precedent, 100 years of application. And I think the – cited in Calderon-Segura, the Seventh Circuit's decision in United States v. Chris, which essentially said that in terms of a forensic science, that there's nothing more with a lengthier period of historical acceptance than fingerprint evidence. And that if there were some evidence that you actually have two individuals with similar fingerprints, that that would be shocking scientific evidence which everyone would have heard of. The underlying scientific principles of fingerprint evidence have been accepted judicially for many years. And, again, I think you're right. The contrary evidence cited by the Petitioner does not somehow change the Court's jurisprudence on an issue. I'd like to address one thing raised by the Petitioner in terms of the immigration judge's obligation to develop the record. And this Court has in a very different context held that immigration judges do have an obligation to develop the record. But it's held that when you have an immigration judge adjudicating something like an asylum claim or a claim for withholding removal or cancellation of removal, a form of relief that immigration judges are intimately familiar with, in those — in that context, an immigration judge may have an obligation to help the Petitioner develop the facts because the immigration judge knows what types of facts are relevant, what you need to establish, what facts you need to put forth to establish an asylum claim, a cancellation of removal claim. Here you're looking at an expert's testimony. And the immigration judge doesn't have either the obligation or necessarily the knowledge or the technical skill to act as a cross-examiner against an expert. An immigration judge isn't necessarily going to know everything there is to know about Dalton points or the one dissimilarity doctrine. In that context, an immigration judge can't be expected to poke holes in the expert's case. Now, the fact that the Petitioner was pro se, you know, unfortunately, he probably did not have the knowledge to be able to do that. But, again, an immigration judge doesn't either. And so in terms of an IJ's obligation to develop the record, that's simply inapplicable in this context. I see I do have time remaining, but unless there are — Yeah. Counsel, I want to turn you to the jurisdictional question. Why does this Court have jurisdiction to review this matter? Well, the Court has jurisdiction — Is there a matter of law or constitution here? Well, I'd frame it more in the context of the Court's jurisdiction to determine jurisdiction. Well, we always have that. I'm not concerned about that. Yes. I'm concerned as to whether we have jurisdiction to remove this. Isn't this a matter of fact? Isn't this a finding of fact by the — Yes. Yes. Ultimately, it is. And if it's a finding of fact, then how do we have jurisdiction to review it? Well, again, the only matter being that the Court needs to determine that the Petitioner is removable or having been — is removable on one of the grounds identified by the — in the notice to appear. So we have to determine whether or not he was an aggravated felon in order to determine whether or not we have jurisdiction. Yes. I mean, jurisdiction to determine jurisdiction. Right. The determination of the fact is the same as the jurisdictional fact. You know, what relief are you asking for? Are you asking for denial of the petition or the dismissal on the grounds of — Ultimately, I would ask for dismissal under INA 242a2c. On the factual question, in other words. Well, I mean, that the — that after adjudicating the question — He is the guy, and so we don't have jurisdiction. Is that what you're saying? I'm sorry, Your Honor. I'm just saying — That he is the person, and so we don't have jurisdiction? Is that what you're saying? Yes. That he is removable on one of the grounds cited in the jurisdiction-serving provision of 242a2c. And therefore, we don't have jurisdiction? Or therefore, the petition should be denied? Therefore, the Court lacks jurisdiction. Okay.  Again, the factual —  I just wanted to make sure. We're just taking a peek at the record to see if we have jurisdiction. Exactly. Once we determine that the ALJ correctly determined that this was the person, he is removable, then we can't go any further. Correct. Correct. Yes. All right. Is there no further questions? Is that all in those comments? Any other questions? Great. Thank you, counsel. Yes. Rebuttal. Thank you. Your Honor, we're not arguing that as to whether fingerprint evidence is generally reliable. The question in this case is whether fingerprint testimony that was, in crucial respects, incomplete and misleading, can constitute clear and convincing evidence of identity when said against abundant evidence against the same. So procedurally, you don't disagree with the government's position that we're just looking at this to determine whether we have jurisdiction over the case. And if we make the determination that there was sufficient, substantial evidence to support the ALJ decision, then we don't have any jurisdiction to go any further in terms of determining the removability. Yes, I believe so, because the initial question is whether or not there was clear and convincing evidence as to whether this was the. Yes, you believe so as well. That the court has to make the determination as to whether they're the same person before the court can determine whether they have jurisdiction. This court and the Supreme Court have a long history of responding to scientific progress, and because this case is about the weight of the evidence presented rather than its admissibility, that is, it's not a Daubert proceeding, it's an opportunity for the court to provide the IJs and those litigating immigration cases with guidance and clarification as to how this standard should be applied to an evolving field of identification. Moreover, with regard to Calderon, that court did not have an opportunity to see the National Research Council's report, because that was published in the subsequent year. And that court, this court now has the opportunity to look at that to illuminate its analysis in determining this case. All right. Thank you. Thank you. The case just argued is submitted for decision by the court. We will be at recess for 10 minutes. All rise.
judges: Arnold, Rawlinson, Bybee